UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Frank J. Steinhauser, III, et al.,

        Plaintiffs,

v.                                                                      Civil No. 04-2632 (JNE/SRN)
                                                                        ORDER
City of St. Paul et al.,

        Defendants.

Sandra Harrilal et al.,

        Plaintiffs,

v.                                                                      Civil No. 05-461 (JNE/SRN)
                                                                        ORDER
City of St. Paul et al.,

        Defendants.

Thomas J. Gallagher et al.,

        Plaintiffs,

v.                                                                      Civil No. 05-1348 (JNE/SRN)
                                                                        ORDER
City of St. Paul et al.,

        Defendants.

---

John R. Shoemaker, Esq., Shoemaker & Shoemaker, PLLC, appeared for Plaintiffs Frank J. Steinhauser, III, Mark E. Meysembourg, Kelly G. Brisson, Sandra Harrilal, and Steven R. Johnson d/b/a Market Group and Properties.

Matthew A. Engel, Esq., Aase, Engel & Kirscher, PLLC, appeared for Plaintiffs Thomas J. Gallagher, Joseph J. Collins, Sr., Dadder's Properties, LLC, Dadder's Estates, LLC, Dadder's Enterprises, LLC, Dadder's Holdings, LLC, Troy Allison, Jeff Kubitschek, and Sara Kubitschek.

Plaintiffs Bee Vue and Lamena Vue did not appear.

Louise Toscano Seeba, Esq., St. Paul City Attorney's Office, appeared for Defendants City of St. Paul, Randy Kelly, Andy Dawkins, Lisa Martin, Steve Magner, Dean Koehnen, Michael Kalis,

Dick Lippert, Kelly Booker, Jack Reardon, Paula Seeley, Mike Cassidy, Joel Essling, Steve Schiller, Joe Yannarelly, Dennis Senty, Michael Urmann, Rich Singerhouse, John Doe, Jane Doe, and Jane Roe.

These three related cases are before the Court on Defendants' motions for summary judgment.[1] The cases are unwieldy because each of the sixteen separate plaintiffs makes different factual allegations about his, her, or its treatment by some subset of the eighteen named defendants. The number of claims asserted by Plaintiffs compounds the unwieldiness of the cases. As foreshadowed by the previous two sentences, resolution of Plaintiffs' claims requires lengthy explanation.

Some commonalities exist between Plaintiffs. Plaintiffs are or were private owners of residential rental properties in the City of St. Paul (City). Plaintiffs rented the properties to low-income households. Plaintiffs, as landlords, received multiple code enforcement orders for conditions existing at their rental properties. In many cases, the code enforcement orders cited between ten and twenty-five violations for conditions including rodent infestation, missing dead-bolt locks, inadequate sanitation facilities, inadequate heat, inoperable smoke detectors, broken or missing doors and screens, and broken or missing guardrails and handrails. In some cases, Plaintiffs' properties were condemned as unfit for habitation.

Plaintiffs claim Defendants enforced the City's minimum residential property maintenance standards against them in a manner that violated state and federal law because Plaintiffs are "private landlords" and because they rented to protected classes. More specifically, Plaintiffs claim the City, former City Mayor Randy Kelly, the former Director of the City's Department of Neighborhood Housing and Property Improvement (DNHPI) Andy Dawkins,

---

[1]   For the sake of brevity, the Court refers to the sixteen plaintiffs collectively as "Plaintiffs" and the eighteen named defendants collectively as "Defendants" unless additional specificity is required.

DNHPI supervisor Steve Magner, and other City employees violated Title VIII of the Civil

Rights Act of 1968, as amended by the Fair Housing Act Amendments of 1988 (Fair Housing

Act), 42 U.S.C. §§ 3601-3619 (2000); 42 U.S.C. §§ 1981, 1982, 1983, 1985 (2000); and the

Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968 (2000),

through their enforcement actions.  Plaintiffs also make claims under Minnesota law for abuse of

process, tortious interference with contract, and tortious interference with business expectancy.

In addition, plaintiffs Thomas J. Gallagher, Joseph J. Collins, Troy Allison, Jeff and Sara

Kubitschek, Dadder's Properties, LLC, Dadder's Estates, LLC, Dadder's Enterprises, LLC, and

Dadder's Holdings, LLC (collectively, Gallagher plaintiffs) assert an antitrust claim under 15

U.S.C. §§ 1, 2, 13, 18 (2000), and claim that chapters 34, 43, 45, and 51 of the St. Paul

Legislative Code are unconstitutionally vague.  For the reasons set forth below, the Court grants

Defendants' motions for summary judgment and dismisses all three cases.[2]

## I.    BACKGROUND

### A.    City of St. Paul Housing Code and Enforcement

Chapter 34 of the St. Paul Legislative Code (housing code) sets forth the minimum

property maintenance standards for all structures occupied or intended to be occupied for

residential purposes in the City.  St. Paul, Minn., Code §§ 34.01, 34.03 (1993).  The stated

purpose of the housing code is to "protect the public health, safety and welfare in all structures

and on all premises."  *Id.* § 34.01.  It "[e]stablishes minimum maintenance standards for all

structures and premises for basic equipment and facilities for light, ventilation, heating and

---

[2]     Plaintiffs ask the Court to reconsider the facts and issues raised in Plaintiffs' earlier motions for sanctions in deciding the present motion.  The Court considered these facts and issues when it affirmed the magistrate judge's orders denying the sanctions motions.  Plaintiffs have not shown any reason why the Court should reconsider these issues, and the Court declines to do so.  *See* D. Minn. LR 7.1(g).

sanitation; for safety from fire; for crime prevention; for space, use and location; and for safe and sanitary maintenance of all structures and premises." *Id.*

In 2003, the City established DNHPI as an executive department responsible for administering and enforcing the housing code. *Id.* § 14A.01 (repealed 2008). Randy Kelly, who was the City Mayor at the time, appointed Andy Dawkins as the director of DNHPI. The responsibilities of DNHPI included inspecting all buildings and properties as required by the City codes; administering and enforcing laws regulating the maintenance of residential property, including the City's vacant building program and the City's rental registration program; and enforcing violations of the City's codes related to property maintenance. *Id.* § 14A.01(b). According to the DNHPI website, DNHPI's mission was to "keep the city clean, keep its housing habitable, and make [its] neighborhoods the safest and most livable [of] anywhere in Minnesota." The DNHPI website identified closing down "problem properties" as one of DNHPI's priorities. The DNHPI website described a "problem property" as "[i]f you live next door to a problem property[,] you know it! Constant calls to get rid of the junk, intolerable behavior by occupants, and guests, etc." Problem properties included both rental and owner-occupied properties.

During Dawkins's tenure as director, DNHPI enforced the housing code by conducting proactive sweeps requested by City District Councils and responding to citizen complaints. According to the DNHPI website, to respond to a citizen complaint, a housing inspector visited the subject property and determined if a violation existed. If the complaint was founded, DNHPI mailed a correction or an abatement order to the occupant and the property owner.

Dawkins created written rules and procedures for DNHPI, which were publicly available from the DNHPI website. These rules stated that DNHPI's goal was consistent application of the

rules, but noted that "universal application of the housing code" was not possible due to

DNHPI's limited resources.  Housing inspectors therefore had discretion in their application of

the rules, in their prioritization of cases, to determine which problems received the closest

scrutiny, and to achieve compliance through a conversation with the property owner rather than

issuing a work order or misdemeanor tag.  To aid housing inspectors in exercising their

discretion, the rules established the following priorities:  serious health and safety cases, problem

properties, garbage and nuisance violations, falling down/dilapidated structures, interior

habitability cases, and structures with multiple violations.

Enforcement tools available to housing inspectors included orders to correct or abate

conditions, condemnation and vacant building registration, criminal charges, and fees for

excessive consumption of City services.  In addition, rental properties were subject to revocation

of rental registration, evictions initiated by the City Attorney, and City-initiated Tenant

Remedies Actions pursuant to Minn. Stat. § 504B.395, subd. 1(4) (2006).  At times, properties

not in compliance with the housing code were required to undergo a "code compliance"

inspection by the City's Office of License, Inspections, and Environmental Protection, which

would evaluate the building's structure, plumbing, electrical condition, and mechanical

condition.

**B.      St. Paul Public Housing Agency**

The St. Paul Public Housing Agency (PHA), a governmental entity separate and distinct

from the City, owns and manages 4300 units of public housing in the City.  The United States

Department of Housing and Urban Development (HUD) funds PHA's public housing program

through an operating subsidy and capital improvement funds.  PHA's public housing includes

high-rise properties, family townhome developments, and 450 "scattered site" properties, which

are single family or duplex properties located throughout the City.  Plaintiffs claim these scattered site properties are similar to their rental properties.  According to PHA documents, the scattered site properties' tenant base is about 32% African-American and 58% Asian/Pacific Islander.

PHA also operates the Section 8/Housing Choice Voucher program (HCV program) for the City.  HUD funds the HCV program.  PHA pays HCV program funds directly to landlords on behalf of households participating in the HCV program.

According to Jon Gutzmann, Executive Director of PHA, there is a shortage of affordable housing in the City.  About 6000 households are on the waiting list for PHA public housing. Approximately 3000 households are on the HCV program's waiting list, which is closed. Although the record does not reflect the demographic breakdown for the City, it is undisputed that non-whites make up a disproportionate percentage of these waiting lists.

PHA properties are subject to the federal Uniform Physical Condition Standard (UPCS). Properties owned by PHA also are subject to the City's codes, including the housing code. According to Henry Petro, Director of Maintenance for PHA, the City sends code enforcement orders to a single contact person at PHA, who then forwards the order to the appropriate PHA department.  City housing inspectors have ordered repairs on PHA homes, primarily for exterior deficiencies.  The City rarely, if ever, condemns a PHA scattered site property, declares a PHA scattered site property a vacant building, or subjects a PHA scattered site property to a code compliance inspection.  The City has, however, condemned non-scattered site PHA properties, including apartments in PHA high-rises.

HUD inspects a subset of PHA properties every two years.  HUD consistently rates PHA as a "high performer" in overall operations.  Between 2002 and 2005, PHA received scores

between 88% and 90% for the physical condition of its properties.  A score over 80% results in HUD inspecting PHA properties every other year rather than every year.

In addition to undergoing HUD inspections, PHA properties are subject to frequent inspections by PHA itself.  According to Al Hester, Housing Policy Director for PHA, every PHA unit is subject to an annual preventative maintenance inspection and an annual housekeeping inspection.  PHA conducts yard-care and building-condition inspections of its scattered site properties five times a year.  PHA also conducts pest-control inspections of its properties.  Petro testified that PHA's maintenance department employs ninety-eight people. Seventy-seven of the maintenance department employees are maintenance line workers.  PHA documents indicate that in 2002, PHA completed 28,577 non-emergency work orders and 6573 emergency work orders.  PHA makes routine repairs in approximately 3.6 days and emergency repairs within 24 hours.

Private-sector properties rented to HCV program tenants must meet the federal Housing Quality Standards (HQS) set forth in 24 C.F.R. § 982.401 (2008), as well as the City's housing code.  According to Hester, the HQS is a lower standard than the UPCS.  In 1995, the City Fire Department compared the City's housing code to the HQS and concluded that the housing code was stricter than the HQS for seventy-seven of the ninety-four items compared, or 82% of the items.  The housing code was as strict as the HQS for twelve items, and the housing code was less strict than the HQS for three items.[3]

---

[3]     The Fire Department classified the relative strictness of two of the ninety-four items as "undetermined."

C.      **Plaintiffs**

Plaintiffs are current or former owners of residential rental properties in the City.  Of the sixteen plaintiffs, three are non-whites.  Plaintiffs describe Sandra Harrilal as "Black American" and Bee and Lamena Vue as Asian-American.  According to Plaintiffs, between 60% and 70% of their tenant base is African-American.

Throughout their Complaints, Plaintiffs allege Defendants committed multiple acts of wrongdoing.  Plaintiffs challenge the legitimacy of code enforcement orders they received and claim that neighboring properties also had code violations but did not receive code enforcement orders.  Plaintiffs claim City housing inspectors and law enforcement personnel conducted unconstitutional searches or inspections of Plaintiffs' rental properties.  Plaintiffs challenge the designation of certain properties as vacant buildings and the legality of code compliance inspections.  Plaintiffs contend that PHA received preferential treatment from the City with respect to housing code enforcement while the City took a "heavy enforcement" and "code to the max" approach with Plaintiffs.  In addition, Plaintiffs claim Defendants targeted them for code enforcement because Plaintiffs rented to protected classes.  Finally, Plaintiffs claim the City intentionally delayed mailings or intentionally sent mailings containing code enforcement orders to wrong addresses to prevent Plaintiffs from responding before a deadline expired.

## II.      DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant satisfies its

burden, the nonmovant must respond by submitting evidentiary materials that "set out specific

facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co.

v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In determining whether summary judgment is

appropriate, a court must look at the record and any inferences to be drawn from it in the light

most favorable to the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.      Claims Against John Doe, Jane Doe, and Jane Roe**

Defendants argue that Plaintiffs' claims against John Doe, Jane Doe, and Jane Roe should

be dismissed because Plaintiffs have not identified them or set forth their involvement with the

matters alleged in the Complaints.  The true identity of those defendants was not uncovered

during discovery.  Accordingly, the Court dismisses the claims against John Doe, Jane Doe, and

Jane Roe without prejudice.  *See Munz v. Parr*, 758 F.2d 1254, 1257 (8th Cir. 1985) (discussing

when dismissal of claims against John and Jane Does is appropriate).

**B.      Fair Housing Act Claims**

Section 3604 of the Fair Housing Act (FHA) makes it unlawful to refuse to sell or rent to

any person or discriminate in the terms, conditions, or privileges of sale or rental of a building on

the basis of race, color, religion, sex, familial status, or national origin.  42 U.S.C. § 3604(a)-(b).

The FHA also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in

the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of

his having aided or encouraged any other person in the exercise or enjoyment of, any right

granted or protected by" section 3604.  *Id.* § 3617.

Until oral argument, it was unclear which protected class Plaintiffs claimed was

discriminated against by Defendants.  In their Complaints, Plaintiffs identified not only "African-

Americans, Hispanics, Asians, American-Indians, families with children, individuals with

disabilities, [and] those receiving state and federal financial assistance," but a broad category

they termed "others less fortunate."  At oral argument, counsel for Plaintiffs clarified that the key

to Plaintiffs' FHA claims is that Plaintiffs rent to a higher percentage of African-Americans than

PHA does.  The Court therefore analyzes Plaintiffs' FHA claims in the context of disparate

impact on African-Americans and disparate treatment of African-Americans.

> ### 1.        Standing

Defendants contend that Plaintiffs lack prudential standing to bring their FHA claims.  By

imposing prudential limits on standing, "the judiciary seeks to avoid deciding questions of broad

social import where no individual rights would be vindicated and to limit access to the federal

courts to litigants best suited to assert a particular claim."  *Gladstone, Realtors v. Vill. of*

*Bellwood*, 441 U.S. 91, 99-100 (1979).  Accordingly, a plaintiff may have Article III standing yet

lack prudential standing because the "asserted harm is a 'generalized grievance' shared in

substantially equal measure by all or a large class of citizens."  *See Warth v. Seldin*, 422 U.S.

490, 499 (1975).  The test for prudential standing "is whether the constitutional or statutory

provision on which the claim rests properly can be understood as granting persons in the

plaintiff's position a right to judicial relief."  *Id.* at 500.

Congress intended standing under the FHA to extend "to the full limits" of Article III.

*See Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 881-82 (8th Cir. 2003).  Plaintiffs

need not be members of a protected class to suffer harm from discrimination.  *See id.* at 881.

Plaintiffs claim that Defendants' enforcement of the housing code against Plaintiffs because of

their tenants' race has caused Plaintiffs harm in the form of increased maintenance costs, and in

some cases, forced Plaintiffs to sell their properties.  These injuries, which result from the

alleged discrimination, are distinct and unique, and fall within the zone of interests protected by the FHA.  Plaintiffs have prudential standing to bring their FHA claims.  *See id.*

## 2.    FHA Disparate Impact

To succeed on their disparate impact claim, Plaintiffs must show that a facially neutral policy results in, or can be predicted to result in, a disparate impact on protected classes compared to a relevant population.[4]  *See Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 902 (8th Cir. 2005).  If Plaintiffs make that showing, Defendants must demonstrate that the objected-to policy has a "manifest relationship" to legitimate, non-discriminatory policy objectives and "is justifiable on the ground it is necessary to" the attainment of those objectives.  *Id.*  If Defendants make that showing, the burden shifts back to Plaintiffs to show that a viable alternative means is available to achieve the legitimate policy objectives without discriminatory effects.  *Id.* at 902-03.

In their memorandum in support of their motion, Defendants argue that Plaintiffs' disparate impact claim fails because Plaintiffs failed to identify a facially neutral policy.  At oral argument, Plaintiffs identified for the first time Defendants' enforcement of the City's housing code instead of the federal HQS as the challenged facially neutral policy.[5]  Defendants made

---

[4]     Counsel for Plaintiffs argued for the first time at oral argument that the federal HQS preempts the City's housing code and that Defendants' conduct violated their duty to affirmatively further fair housing.  As Plaintiffs did not raise these arguments in their motion papers (despite describing the duty in their recitation of the facts), Defendants have had no opportunity to address them.  Plaintiffs' belated claims of preemption and violation of the duty to affirmatively further fair housing are insufficient to avoid summary judgment.  *See N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1056-57 (8th Cir. 2004).

[5]     In their brief, Plaintiffs direct the bulk of their disparate impact arguments to Defendants' alleged "targeting" of Plaintiffs for aggressive code enforcement and Defendants' alleged preferential treatment of PHA.  The Court considers these arguments in the context of Plaintiffs' FHA disparate treatment claim and equal protection claim.

arguments in their memoranda addressing whether the City's housing code policies have an adverse impact on a protected class, whether the City's policies are justifiable as necessary to achieve legitimate policy objectives, and whether an alternative policy exists that would permit Defendants to achieve those objectives without discriminatory effects.  Because Defendants addressed these aspects of Plaintiffs' disparate impact claim, the Court considers Plaintiffs' disparate impact claim despite Plaintiffs' untimely identification of the challenged facially neutral policy.

Plaintiffs claim that enforcement of the housing code, which is stricter than the HQS for 82% of the items considered,[6] has a disparate impact on African-Americans because compliance with the housing code increases the costs of low-income housing and African-Americans make up a disproportionate percentage of low-income tenants.[7]  Plaintiffs' argument, without supporting evidence, is insufficient to withstand summary judgment.  Plaintiffs must do more than show that the housing code increases the cost of low-income housing and that minorities tend to have lower incomes.  *See Reinhart v. Lincoln County*, 482 F.3d 1225, 1230 (10th Cir. 2007) ("It is not enough for the [plaintiffs] to show that (1) a regulation would increase housing costs and (2) members of a protected group tend to be less wealthy than others.  It is essential to

---

[6]     Plaintiffs place great weight on the City Fire Department's conclusion that the City's housing code was stricter than the HQS for 82% of the items considered.  The 82% figure, in isolation, is not particularly helpful to the disparate impact analysis because the cost of complying with each item varies.  For example, the cost of ensuring that structural members are structurally sound would differ greatly from the cost of ensuring that deadbolt locks have a one-inch throw.  Accordingly, the Court cannot conclude that the City's housing code is 82% stricter than the HQS as a whole, or perhaps more critically to the question of disparate impact, that the cost of compliance with the City's housing code is 82% greater than the cost of compliance with the HQS.

[7]     The parties agree that African-Americans make up a disproportionate percentage of low-income tenants in both private and PHA housing.

be able to compare who could afford the housing before the new regulations with who could

afford it afterwards.").  To make a prima facie case of disparate impact and withstand

Defendants' motion for summary judgment, Plaintiffs needed to offer evidence establishing what

rents are under the City's housing code, what rents would be under the HQS, and the percentages

of African-Americans and non-African-Americans who could not afford to rent in the City

because the City enforced the housing code rather than the HQS.  *See id.* at 1230-31.  Plaintiffs

offered no such evidence.[8]

Instead, Plaintiffs argue that two pieces of evidence support their claim of disparate

impact:  the shortage of affordable housing in the City and the 2006 Mortgage Foreclosure and

Vacant Buildings Trends in St. Paul report (Vacant Buildings report).  The Court addresses each

in turn.

First, Plaintiffs contend that the City's affordable housing shortage supports a conclusion

of disparate impact.  No evidence suggests that Defendants' enforcement of the housing code

---

[8]     At oral argument, counsel for Plaintiffs argued that Kelly Brisson had passed an HQS
inspection shortly before receiving code enforcement orders from DNHPI.  Plaintiffs did not
present evidence of the costs incurred by Brisson in complying with housing code requirements
that exceeded HQS requirements.  Further, the HQS inspection encompassed only the lower unit
and basement of Brisson's property.  Because Plaintiffs put forth no evidence showing which
violations were found in the portions of Brisson's property that passed the HQS inspection and
which were not, the Court cannot determine whether Brisson received correction orders for
conditions that complied with the HQS.  At least two of the conditions for which DNHPI cited
Brisson after the HQS inspection—a missing interior handrail and a missing upper-story window
screen—also violated the HQS.  Brisson admitted these conditions existed.  Thus, the fact that
Brisson received code enforcement orders two months after a portion of his property passed an
HQS inspection does not establish that enforcement of the City's housing code rather than the
HQS increases costs or rents, much less the extent of the increase.

Counsel also argued that Bee and Lamena Vue received code enforcement orders after
passing an HQS inspection.  The Vues did not appear for their noticed deposition, and no
evidence in the record supports this claim.  The Court will not consider counsel's argument
regarding the Vues.  *See Wittenburg v. Am. Exp. Fin. Advisors, Inc.*, 464 F.3d 831, 838 (8th Cir.
2006) (arguments of counsel are not evidence).

caused or contributed to the City's affordable housing shortage.  Jon Gutzmann, Executive

Director of PHA, identified insufficient federal funding as contributing to the affordable housing

shortage.  He did not identify the housing code as a contributor.  His testimony is undisputed.

The existence of an affordable housing shortage does not support Plaintiffs' claim of disparate

impact.

Second, Plaintiffs put forth the Vacant Buildings report as evidence of disparate impact.

According to Plaintiffs, the number of vacant homes in the City increased from 367 in 2003 to

1466 in 2007.  Relying on the statement in the Vacant Buildings report that "foreclosed

properties are or were disproportionately renter-occupied," Plaintiffs argue that enforcement of

the City's housing code caused the increase in vacant buildings.  The Vacant Buildings report

suggests that an increase in foreclosures caused the increase in vacant buildings and identifies

equity stripping, predatory lending practices, sub-prime lending, unforeseen life events such as

loss of income and health issues, increasing interest rates, and unemployment levels as causes of

foreclosures.  The Vacant Buildings report does not identify enforcement of the City's housing

code as a cause of increased vacancies or foreclosures.  Therefore, the Vacant Buildings report

does not support Plaintiffs' disparate impact claim.  Plaintiffs have not made a prima facie case

of disparate impact.

Even if Plaintiffs had made a prima facie case, Defendants contend that enforcement of

the housing code rather than the HQS has a manifest relationship to legitimate, non-

discriminatory policy objectives and is necessary to attain those objectives.  *See Darst-Webbe*,

417 F.3d at 902-03.  Defendants identified DNHPI's objectives as providing minimum property

maintenance standards, keeping the City clean and housing habitable, and making the City's

neighborhoods the safest and most livable of any in Minnesota.  Plaintiffs do not dispute that

these objectives are legitimate and non-discriminatory, that enforcement of the housing code has a manifest relationship to these objectives, or that enforcement of the housing code is necessary to achieving those objectives.  Accordingly, Plaintiffs can only prevail on their disparate impact claim by showing that a viable alternative exists that would allow Defendants to achieve the same objectives without discriminatory effects.  *See id.* at 903.

At oral argument, counsel for Plaintiffs argued that the HQS is a viable alternative to the housing code.  Plaintiffs have not put forth any evidence showing Defendants could achieve their legitimate, non-discriminatory policy objectives if they adopted the HQS.  According to the Fire Department's analysis, the HQS contains no provision at all for a number of exterior conditions, including sanitation, extermination, and lighting.  Because these exterior conditions affect the safety and cleanliness of the City, adoption of the HQS would prevent Defendants from achieving their policy objectives.  Further, although Plaintiffs assume that the HQS would have a less discriminatory effect because it is a laxer standard, they presented no evidence showing the effect of adopting the HQS on the availability of low-income housing or the expected decrease in rents.  Thus, even if Plaintiffs had made their prima facie case, they could not prevail on their disparate impact claim because they have not shown the HQS permits Defendants to achieve their legitimate, non-discriminatory policy objectives without discriminatory effects.[9]  *See id.* at 906.

---

[9]     Plaintiffs identified the City's former Problem Properties 2000 (PP2000) program as a viable alternative in their brief.  The PP2000 program focused on communicating with landlords of properties having a history of repeated or unresolved code violations to formulate a better plan for compliance rather than simply imposing punishment.  Frank Steinhauser was a participating landlord.  Having identified the City's use of the housing code rather than the federal HQS as the challenged facially-neutral policy, Plaintiffs apparently no longer assert that the PP2000 is a viable alternative.  Further, Plaintiffs offered no evidence showing that the PP2000 program would achieve the DNHPI's objectives without discriminatory effect.  Because participating landlords were not excused from compliance with the housing code, they would still incur the

It is for the City, not the Court, to strike the proper balance between the need for safe, clean, and habitable housing and the need for low-income housing.  In the absence of evidence supporting Plaintiffs' allegations of disparate impact on African-Americans, the Court declines to rewrite the City's housing code.  The Court dismisses Plaintiffs' disparate impact claim.

### 3.      FHA Disparate Treatment

Plaintiffs make a claim for disparate treatment under the FHA.  Disparate treatment, which occurs when some people are treated less favorably than others because of their race, color, religion, sex, or national origin, "is the most easily understood type of discrimination." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).  Proof of discriminatory motive is crucial to a disparate treatment claim.  *Id.*

Plaintiffs may survive summary judgment on their disparate treatment claims by presenting either "direct evidence" of discrimination or "creating the requisite inference of unlawful discrimination" under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004); *East-Miller v. Lake County Highway Dept.*, 421 F.3d 558, 563 (7th Cir. 2005) (distinguishing between "direct evidence" and *McDonnell Douglas* framework in FHA context). In the context of Plaintiffs' disparate treatment claim, "direct evidence" is not the opposite of circumstantial evidence.  *See Griffith*, 387 F.3d at 736.  Rather, the term "direct" refers to the causal *strength* of the proof.  *Id.* (emphasis added).  "[D]irect evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated'" the adverse action.  *See id.*  Direct evidence does not include stray remarks, statements by

same costs of compliance with the housing code, leaving any alleged discriminatory effect on African-Americans unchanged.

nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself.

*See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 933 (8th Cir. 2006) (quotation marks omitted);

*Harris v. Itzhaki*, 183 F.3d 1043, 1055 (9th Cir. 1999) (applying direct evidence exclusions in

FHA context).

A plaintiff with direct evidence that illegal discrimination motivated the adverse action

does not need the three-part *McDonnell Douglas* analysis to survive summary judgment, even if

the strong evidence is circumstantial.  *See Griffith*, 387 F.3d at 736.  A plaintiff who lacks

evidence that clearly points to the presence of an illegal motive, however, can only avoid

summary judgment by creating the requisite inference of unlawful discrimination under the

*McDonnell Douglas* framework.  *Id.*

Under the *McDonnell Douglas* framework, once the plaintiff establishes a prima facie

case of discrimination, the burden shifts to the defendant to articulate a legitimate,

nondiscriminatory reason for its actions.  *See Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d

906, 914 (8th Cir. 2007).  If the defendant offers a legitimate, nondiscriminatory reason, the

burden shifts back to the plaintiff to put forth evidence showing the defendant's proffered

explanation is a pretext for unlawful discrimination.  *Id.*  Plaintiffs make no argument under the

*McDonnell Douglas* framework.  The Court therefore considers whether Plaintiffs have offered

evidence showing a specific link between the alleged discriminatory animus and the challenged

decision that is sufficient to support a finding by a reasonable fact finder that an illegitimate

criterion actually motivated the adverse action.

Plaintiffs contend that a December 2005 e-mail chain originated by Jane Prince, a

legislative aide to former City Council member Jay Benavav, demonstrates that the City knew its

code enforcement targeted minorities, but dismissed the discriminatory effect and took no

remedial action.  Prince's e-mail related to a call from a City resident who was concerned that her neighbors were calling in complaints about her because she was a person of color.  In the e-mail, Prince said that there was a "very real possibility that people of color are unfairly targeted by the city's complaint[-]based system."  Prince also wrote that her office would set up a block meeting with the neighbors to address this concern.

The e-mail chain demonstrates that the resident was concerned about the neighbors, not the City, targeting her on the basis of race.  Further, it is clear from the e-mail chain that the City took the resident's concerns seriously and sought to resolve the issue.  The Prince e-mail chain is not evidence of discriminatory animus on the part of Defendants.

Plaintiffs contend the City Council's "Chronic Problem Properties in Saint Paul:  Case Study Lessons" report (Problem Properties report) shows bias and discrimination on the part of City residents.  The Problem Properties report does not condone or even accept City residents' bias, and is not evidence that Defendants harbored any discriminatory animus toward African-Americans.

Plaintiffs also contend that the Problem Properties report used "derogatory labels"—such as "Down 'n Out"—to refer to protected class residents.  The record does not support this contention.  The Problem Properties report states that "'Down 'n Out' is a large, old mansion converted into 20 single resident units."  "Down 'n Out" refers to the mansion, not the residents.  The Problem Properties report does not use derogatory labels to refer to residents in general or African-Americans in particular.  Nothing in the Problem Properties report suggests any discriminatory animus on the part of Defendants.

Plaintiffs quote several statements made by Kelly and Dawkins while they were state legislators back in the 1980s and 1990s.  After reviewing the statements, the Court concludes

that the statements are not direct evidence of discrimination.  For example, Plaintiffs quote Kelly as saying:

> Saint Paul needs to do all that it can to preserve and improve the existing privately owned rental stock that provides much of our affordable housing, where owners are now struggling with maintenance and management issues.  If we lose that housing stock, we have lost a great housing resource in the city.

Nothing in this quotation, or any of the others offered by Plaintiffs, suggests any discriminatory animus toward African-Americans.  Rather, this statement evidences Kelly's belief that the City needs to preserve privately-owned affordable housing.

Even if the Court were to assume that these statements evidenced discriminatory animus toward African-Americans, given that Kelly and Dawkins made these statements at least a decade before Defendants made any decision challenged in this lawsuit, they would not be direct evidence of discrimination.  At most, they would be "statements by decisionmakers unrelated to the decisional process itself."  *See Twymon*, 462 F.3d at 933.

Plaintiffs offer the City's decision to use its housing code rather than the HQS as direct evidence of discrimination.  Plaintiffs contend that the City failed to disclose the differences between the City's housing code and the HQS to the public and to HUD.  The City's housing code is set forth in Chapter 34 of the St. Paul Legislative Code.  The HQS is set forth in 24 C.F.R. § 982.401.  Both standards are matters of public record, and the differences are not concealed from anyone.

Plaintiffs claim the City recognized that proceeding with its housing code instead of the HQS would adversely affect the availability of affordable housing in the City and proceeded with the intent of causing that adverse effect.  In a memorandum cited by Plaintiffs, Dawkins wrote:

> No code enforcement program can be universal – 24/7 on every violation at every property – there's just not enough resources; moreover, in most cities a balance has to be struck between aggressive enforcement to preserve livability

and over-zealous enforcement potentially leading to wholesale abandonment of properties or the inner-city.

> In St. Paul the balance has been struck this way . . . [listing measures permitting the City to become more pro-active without increased resources].

In a section of deposition transcript also quoted by Plaintiffs, Dawkins said:

> I used the example of Baltimore where the aggressive enforcement had tipped the scale so that there was a start of abandonment of properties more than the city had hoped for in Baltimore.  And I wanted to make sure that everyone understood that using whatever levers or rules or policies the city has, that we need to make sure that we didn't hit a tipping point.

When considered in context, Dawkins's statements illustrate his desire to avoid wholesale abandonment of properties and his belief that the City's policies did not cause wholesale abandonment.  Dawkins's statements do not suggest any discriminatory animus.  Further, no evidence suggests that the City designed and enforced its housing code with the intent of reducing the availability of affordable housing.

Plaintiffs claim other memoranda authored by Dawkins are direct evidence of discrimination.  One memorandum relates to a request made by Kelly that City departments think of instances where City government might be susceptible to racism and develop corrective measures.  Plaintiffs claim Dawkins's statement that "[p]erhaps a disproportionate number of folks getting [excessive consumption] bills are people of color, but if this is so, then maybe it's because a disproportionate number of families living in poverty are people of color" is evidence of discriminatory animus.  The fact that Dawkins continues "[a]nd if this is so, then maybe we should seriously move forward on hiring someone to . . . help this group find the resources to get the job done" belies Plaintiffs' argument.  Rather than showing discriminatory animus, this memorandum is evidence of Dawkins's desire to reduce excessive consumption fees imposed on people of color by helping them find the resources to repair their properties.

Another memorandum authored by Dawkins and quoted by Plaintiffs states:

> As you know, the new way to bill-out for excessive consumption is extremely easy compared to the old way.  Everything counts – so you don't have to comb the file for exterior property violations, you don't have to count to four cycles, etc.  And, we get to assess the bill to the property taxes if not paid.  I estimate the new ordinance will bring in half a million dollars or more, and the Mayor has basically said it's [ours] to spend – which is good, because . . . the new rental registration ordinance will likely increase the number of interior inspections we do by a substantial amount and either we're going to get a lot of overtime, or [we're] going to have to do some new hires.

The Court discerns no evidence of discriminatory animus in this description of the new excessive consumption and rental registration ordinances.

Plaintiffs claim a statement Dawkins made to Bill Cullen, a real estate investor, is direct evidence of discrimination.  Cullen testified that Dawkins had asked a group of landlords "how would [the landlords] feel if all those tenants that are at the bottom of the box were no longer in St. Paul?"  Dawkins's statement is facially neutral with respect to race, but Plaintiffs suggest that this statement reveals a racially discriminatory mindset.  The Court therefore considers the statement's context.  *See Twymon*, 462 F.3d at 934.

According to Cullen, Dawkins made this statement during a meeting about how to improve neighborhood conditions in the City's Payne/Phalen neighborhood.  The executive director of the Payne/Phalen neighborhood suggested that landlords screen their tenants, which prompted a discussion about the attributes of low-income tenants.  Cullen drew a box for the meeting participants showing the "best" tenants as those with the most income, best credit, and least criminal history.  The "bottom of the box" tenants were those having poor credit scores, criminal records, poor rental histories, and lower incomes.  Race was not one of the attributes discussed.

Cullen interpreted Dawkins's statement as a statement that Dawkins was trying to get rid of the "bottom of the box" tenants.  Even if the Court assumes Cullen's interpretation is correct, Plaintiffs ask the Court to then conclude that Dawkins's desire to exclude "bottom of the box"

tenants from the City meant that Dawkins was trying to exclude persons of color—specifically, African-Americans—from the City.  While the Court must draw all reasonable inferences in favor of Plaintiffs on Defendants' motion for summary judgment, the Court shall "do so without resort to speculation."  *See Twymon*, 462 F.3d at 934.  Dawkins's race-neutral statement made in the context of a discussion about improving the conditions of the Payne/Phalen neighborhood reveals no discriminatory animus.  *See id.* (facially race-neutral statements, without more, do not demonstrate racial animus).

Plaintiffs also offer a statement Dawkins made to Sara Anderson, a housing advocate.  According to Anderson, Dawkins said that he "didn't want low-income individuals renting in the City."[10]  Dawkins made this statement during a meeting to discuss Steinhauser's properties attended by Dawkins, Steinhauser, and Anderson.  No evidence suggests that this facially race-neutral statement arose from racial animus on the part of Dawkins.  *See id.*

Plaintiffs claim an affidavit from Steve Mark, a St. Paul landlord, supports their disparate treatment claim.  According to Mark, a City Fire Inspector issued an overcrowding citation for an apartment containing three Hispanic tenants but did not issue an overcrowding citation for an identically-sized apartment in the same building housing three white tenants.  Mark claims the square footage of both apartments complied with City codes regarding occupancy.  The housing code sets forth several criteria in addition to the required space in a dwelling unit for determining legal occupancy, including minimum ceiling height, required space in sleeping rooms, and the presence of an escape window meeting certain specifications.  St. Paul, Minn., Code § 34.13.  Mark's affidavit did not provide the stated basis for the overcrowding order or indicate whether

---

[10]    Anderson also testified that she never heard Dawkins make any other negative statements about low-income tenants, nor did she ever hear any other City employee say they did not want low-income people renting in the City during subsequent discussions.

the apartments and sleeping rooms were equivalent with respect to all relevant criteria.  The

record does not indicate that Mark appealed the overcrowding order.  The Court therefore cannot

conclude that the overcrowding order was improper, much less that it was based on racial

animus.  Even if the Court assumed that the overcrowding order demonstrated racial animus

toward Hispanics, the order would not support Plaintiffs' claim of discrimination against

African-Americans.  *See Griffith*, 387 F.3d at 736 (evidence that employer made insensitive

remarks about African-American and women employees not direct evidence of discrimination

against Hispanic employee).

Plaintiffs point to the deposition testimony of former Legal Aid attorney Perry DeStefano

as direct evidence of discrimination.[11]  DeStefano testified regarding his representation of Robert

King, an African-American tenant/caretaker of a building located at 321 Bates Avenue.  King

was challenging the decision of the City's Department of Fire and Safety Services (DFSS) to

revoke the certificate of occupancy for 321 Bates Avenue.

DeStefano testified that his client had not received correction orders from the City.  The

St. Paul Legislative Code states "[t]he fire marshal may, in writing, issue a notice to the owner(s)

and the interested parties known to the fire marshal of the city's suspension or revocation of a

fire certificate of occupancy."  St. Paul, Minn., Code § 40.06(a).  The minutes from King's

legislative appeal indicate that DFSS sent the correction orders to the property owner, who lived

in Georgia.  The property owner did not give written authorization to the City to send copies of

DFSS notices, reports, and other correspondence to King or inform the City that King had the

authority to evict tenants and manage the property until after King appealed the notice of

---

[11]     For the most part, DeStefano's testimony and supporting exhibits are likely hearsay.
Because Defendants did not make this argument in their motion papers, the Court considers
DeStefano's testimony and supporting exhibits for the purposes of this motion.

condemnation.  The City's decision to mail correction orders to the property owner in

accordance with the law is not direct evidence of intentional discrimination on the basis of race.

DeStefano believed that a letter dated July 22, 2004, from DFSS listing a number of code

deficiencies identified during a July 12, 2004, inspection was "backdated" because it indicated

that a re-inspection would occur on or after July 12—the same date as the inspection and ten

days before the date on the letter.  Plaintiffs offer no evidence that the letter was backdated rather

than simply delayed.  Further, no evidence suggests that the delayed mailing was intentional,

motivated by the race of the tenants residing at 321 Bates Avenue, or anything other than clerical

or computer error.  The delayed mailing is insufficient to raise an inference of discrimination.

*See Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004) (no inference of discrimination

when inability of one African-American to pay by check was likely computer malfunction).

Finally, although DeStefano believed that neighbors were making false allegations to the

police because of the tenants' protected class status, discriminatory animus on the part of

neighbors is not evidence of discriminatory animus on the part of Defendants.[12]

Plaintiffs offer a statement by Assistant City Attorney Maureen Dolan as direct evidence

of intentional discrimination.  Bee Vue, a Laotian immigrant, stated in an affidavit that Dolan

told him "[p]ersonally, I don't think you people deserve to be in this country."  According to

Vue, Dolan made this statement after Vue expressed his concern that a misdemeanor criminal

citation for a housing code violation could affect his application for U.S. citizenship.  While the

Court does not condone such a statement, it is a stray comment unrelated to the decision to issue

the misdemeanor citation or any other challenged decision, and is not direct evidence of

---

[12]     DeStefano himself recognized this, as he stated in a letter regarding his representation of
King "I know the City did not intend to have a disparate impact."

discrimination.  *See Twymon*, 462 F.3d at 934.  It was a housing inspector, not Dolan, who issued

the misdemeanor citation.

Moreover, Plaintiffs' FHA claim is premised on their argument that the City prefers

Asian-American tenants to African-American tenants.  Dolan's statement, directed toward a

Laotian immigrant, could not possibly refer to African-Americans, and therefore does not

support a claim of discrimination based on the African-American status of Plaintiffs' tenants.

*See Griffith*, 387 F.3d at 736.

Plaintiffs argue that the opinion of Cathleen Royce, leader of the Community

Stabilization Project (CSP), that "Magner is racist" is direct evidence of intentional

discrimination.[13]  Royce testified about her opinion of Magner as follows:

> **Q:**   Now, you mentioned Steve Magner.  When did you first have any contact
> with Steve Magner in any shape within the City of St. Paul structure?
>
> **A:**   Back in the day, so James Trice, who was with CSP as an organizer for the
> first year maybe that I was director, maybe two years, and James is an
> African American man, fairly intelligent, very outspoken and had very
> negative interactions with Magner.
>
> **Q:**   Was this back in the mid 1990s?
>
> **A:**   Probably, even earlier than that maybe.
>
> **Q:**   Did you ever have any observations as to Mr. Trice and Mr. Magner's
> interactions that you personally saw?
>
> **A:**   Yeah.  And here we're riding on the edge of my memory, but I had strong
> feelings about it that I'm – there were a couple of interactions that I either
> was a party to over the phone or in person that I – again it's a very vague

---

[13]   Royce also testified that tenants renting from Steinhauser, Johnson, and Bee Vue came to
CSP for assistance in forcing these landlords to make repairs.  Royce testified that she visited
one of the properties for which Steinhauser challenges code enforcement activity after CSP
received a complaint from the tenant, who was caring for an infant.  The tenant's apartment
lacked adequate heat and did not have a door between the apartment and a common hallway.
The stove and refrigerator did not work.  There were holes in the wall, and Royce saw two mice
while she was present.

> memory, but – and I've had – I believe Magner is racist and had some
> issues with James.

Royce was unable to provide any specifics as to Magner's allegedly racist behavior.  Royce's

opinion, based on two vaguely remembered interactions she observed several years before the

events giving rise to this lawsuit, is not direct evidence of discrimination.

Finally, Plaintiffs argue that the City's decision to terminate the PP2000 program,

through which the City worked with landlords to achieve their compliance with the housing

code, is direct evidence of discrimination.  Plaintiffs contrast the City's decision to terminate the

PP2000 program with the City/PHA partnership on crime prevention at PHA's family townhome

developments through the A Community Outreach Program (ACOP).  Plaintiffs do not explain

the relevance of the City's crime-prevention efforts to the City's relationship with landlords,

including Steinhauser, who owned properties with a "history of unresolved or repeat [housing

code] violations."  Plaintiffs have offered no evidence that discriminatory animus motivated the

City's decision to terminate the PP2000 program.  In the absence of evidence that an illegitimate

criterion actually motivated the City's decision to terminate the PP2000 program, it is not the

Court's role to second-guess the wisdom of the City's policies.  The Court cannot conclude that

the City's decision is direct evidence of discrimination.

Much of Plaintiffs' evidence does not support a conclusion of racial animus toward

African-Americans, and none of the evidence shows a specific link between the alleged racial

animus and any challenged decision sufficient to support a finding by a reasonable finder of fact

that an illegitimate criterion actually motivated a challenged decision.  For these reasons,

Plaintiffs have not supported their claims of disparate treatment using direct evidence.  *See*

*Griffith*, 387 F.3d at 736.  Because Plaintiffs have failed to create a genuine issue of material fact

as to whether Defendants intentionally discriminated against Plaintiffs on the basis of their

tenants' African-American status, the Court dismisses Plaintiffs' FHA disparate treatment claims.

## C.      Section 1981 and 1982 Claims

Plaintiffs are required to show discriminatory intent to prevail on their claims under 42 U.S.C. §§ 1981, 1982.  *Dirden v. Dep't of Housing and Urban Dev.*, 86 F.3d 112, 114 (8th Cir. 1996).  As discussed with respect to Plaintiffs' FHA disparate treatment claim, Plaintiffs have not shown discriminatory intent on the part of Defendants.

Plaintiffs argue that *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673 (D.C. Cir. 2006), supports their § 1981 claim.  In *2922 Sherman*, the District of Columbia's lack of explanation for how it narrowed a list of seventy-five properties recommended for closure that were evenly distributed across the city down to five apartment buildings located in neighborhoods having an average Hispanic population 4.4 times that of the city as a whole supported an inference of intentional discrimination.  444 F.3d at 684.  Here, Plaintiffs submit maps showing their properties are located in areas having a high percentage of minorities, but offer no evidence showing their properties were targeted while other properties in similar condition located in areas having a low percentage of minorities were not.  Plaintiffs' maps are not evidence of intentional discrimination.  Plaintiffs' § 1981 and 1982 claims fail.

## D.      Section 1983 Claims

Plaintiffs make claims under 42 U.S.C. § 1983 for alleged violations of their rights under the Fourth, Fourteenth, and Fifth Amendments to the United States Constitution.  Success on a § 1983 claim requires a showing of: "(1) [a] violation of a constitutional right, (2) committed by a state actor, (3) who acted with the requisite culpability and causation to violate the constitutional right."  *Shrum v. Kluck*, 249 F.3d 773, 777 (8th Cir. 2001).

### 1.     Fourth Amendment

Plaintiffs claim Defendants violated Plaintiffs' Fourth Amendment right to freedom from unreasonable searches and seizures when City code enforcement and law enforcement officers conducted warrantless searches of Plaintiffs' rental properties without valid consent.  Defendants contend that Plaintiffs lack standing to assert this claim because Plaintiffs have no reasonable expectation of privacy in their tenants' apartments.[14]  Plaintiffs did not respond to this argument.[15]  Nothing in the record suggests that these landlords had a reasonable expectation of privacy in their tenants' apartments.  Plaintiffs therefore lack standing to bring § 1983 claims based on searches of their tenants' apartments.  *See Rozman v. City of Columbia Heights*, 268 F.3d 588, 591 (8th Cir. 2001).

### 2.     Fourteenth Amendment

Plaintiffs allege violations of their Fourteenth Amendment right to equal protection as a result of the City's code enforcement policies.  The Equal Protection Clause of the Fourteenth Amendment requires state actors to treat similarly situated people alike and permits state actors to treat dissimilarly situated people dissimilarly.  *Ganley v. Minneapolis Park & Recreation Bd.*, 491 F.3d 743, 747 (8th Cir. 2007).  As a threshold matter, Plaintiffs must establish that Defendants treated them differently from similarly situated landlords.  *Id.*  In addition to unequal

---

[14]     Technically speaking, there is no doctrine of "standing" in Fourth Amendment law.  However, courts in the Eighth Circuit use the term "standing" as a shorthand reference to the issue of whether a party's Fourth Amendment interests are implicated.  *See United States v. Green*, 275 F.3d 694, 698 n.3 (8th Cir. 2001).

[15]     Plaintiffs asserted for the first time at oral argument that their Fourth Amendment claim was really an interference claim under the FHA.  As Plaintiffs did not plead this claim in their Complaints or raise it in their motion papers, Defendants have had no opportunity to address this argument.  The Court will not consider Plaintiffs' FHA interference argument as it relates to the challenged searches and inspections.  *See N. States Power Co.*, 358 F.3d at 1056-57.

treatment, Plaintiffs must also show intentional or purposeful discrimination.  *See Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007).

Plaintiffs allege violations of equal protection based on several grounds.  First, Plaintiffs contend that Defendants targeted Plaintiffs' properties because Plaintiffs rented to African-Americans.  As discussed with respect to Plaintiffs' FHA disparate treatment claim, Plaintiffs have put forth no evidence showing intentional discrimination on the part of Defendants. Plaintiffs' equal protection claim based on race fails.  *See id.*

Plaintiffs make a "class of one" equal protection argument based on what Plaintiffs describe as the City's preferential treatment of the St. Paul Public Housing Agency.  The purpose of a class-of-one equal protection claim is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Plaintiffs may prevail on their class-of-one claim by showing they have been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Id.*; *see also Costello v. Mitchell Pub. School Dist. 79*, 266 F.3d 916, 921 (8th Cir. 2001).

Plaintiffs first contend that the City routinely closed housing code inspection files for PHA properties without action or a follow-up inspection.  Plaintiffs cited a number of inspection records in support of this claim.  The Court's review of the inspection records reveals that they fail to support Plaintiffs' allegation of inaction or no follow-up inspections.  For example, the inspection records indicate that DNHPI received a complaint about a PHA property on May 1, 2003, for debris and furniture in the yard.  The inspector left a message with PHA.  When the inspector rechecked the property on May 12, the furniture and debris were gone.  DNHPI

29

received a complaint about three abandoned vehicles in the yard and alley at another PHA

property on May 13, 2003.  The inspector checked the property and found that all three vehicles

had current license plate tabs.  He called PHA and was told that PHA would tell the tenants to

move the cars off the grass.  DNHPI kept the file open until the inspector verified that all of the

vehicles were removed.  While conducting a sweep in July 2004, DNHPI found a PHA property

that had household items and vehicle parts in the back yard.  The inspector called PHA.  When

the inspector checked back in early August, the items and vehicle parts were gone.

Further, the records offered by Plaintiffs show that a PHA property received a correction

order for sanitation in August 2001, another PHA property received a vehicle abatement order in

May 2002, and a third PHA property received a correction notice for refuse, lack of garbage

bins, and inadequate paint/siding underneath a window.  In short, the evidence does not support

Plaintiffs' claims of inaction and no follow-up inspections.

Plaintiffs also make allegations of preferential treatment because the City has never

subjected a PHA scattered site property to a code compliance inspection, condemned a PHA

scattered site property, or declared a PHA scattered site property a vacant building.  As an initial

matter, Plaintiffs do not identify any PHA scattered site property that *should* have been subject to

these regulatory activities.  Instead, Plaintiffs make the broad claims that "PHA has a history of

being subject to serious health and safety complaints on [its] properties" and "PHA homes also

appear to be frequently subject to mold growth and wet basements."  The record indicates that

four scattered site properties—out of 450—experienced mold problems.  In the most severe case,

after working with the tenant for several years, PHA installed a new roof and siding and then

hired an independent contractor to test for mold and make additional recommendations for

repair.  This evidence does not demonstrate that any PHA property should have been subject to a code compliance inspection, declared a vacant building, or condemned.

Plaintiffs also contend the residents at one of PHA's high-rise buildings complained of and had to live with "deadly mold conditions" for a "considerable period of time."  The record reflects that PHA became aware of a mold problem in a high-rise building on March 8, 2000, after residents in seven apartments complained.  An April 14, 2000, report from an indoor air and mold expert retained by PHA indicated that the expert found high levels of potentially toxic mold in one apartment and growth of the mold on sheetrock in a second apartment.  Leaky showers caused the mold problem.  PHA released emergency funds and began repairs of the 124 leaky showers in May 2000.  No evidence suggests that PHA failed to correct the mold problem in a timely manner once it became aware of it, much less that DNHPI should have condemned the apartments, declared the high-rise or portions of it a vacant building, or subjected the high-rise to a code compliance inspection.

Finally, Plaintiffs cite a 2001 list of high-rise resident comments on PHA's capital fund program as evidence that PHA had a "wide variety of other problems with proper maintenance of its public rental units."  Plaintiffs have put forth no evidence showing these comments demonstrate the need for a code compliance inspection, condemnation, or vacant building declaration.  Many of the comments do not even relate to the housing code.  (E.g., "Install more shade trees on the Hi-Rise grounds," "Install more storage – would like lockers in the basement," "Install a large screen TV," and "Need more grocery carts".)

Even if the Court assumed that PHA properties received preferential treatment from the City, Plaintiffs would still be required to show there is no rational basis for the difference in treatment between Plaintiffs and PHA to prevail on their class-of-one equal protection claim.

*See Costello*, 266 F.3d at 921.  PHA is an organization with a comprehensive inspection schedule, staff dedicated to maintenance, and a demonstrated record for maintaining its properties.  Plaintiffs have not put forth any evidence showing that PHA's properties are in poor condition or that PHA fails to make repairs or correct situations after receiving notification of a violation of the housing code.  On the contrary, the record indicates that PHA responds appropriately to DNHPI correction orders and makes repairs in a timely manner.  Given the City's limited resources and PHA's record of maintaining its properties, Defendants have a rational basis for permitting PHA to manage its own repairs.

Plaintiffs also appear to make a class-of-one equal protection argument on the grounds that they received housing code enforcement orders when property owners having similar code violations were not cited.  To succeed on such a claim, Plaintiffs must demonstrate that their neighboring property owners were not just similar, but "prima facie identical in all relevant respects."  *See Lerch v. City of Green Bay*, 271 F. App'x. 528, 529-30 (7th Cir. 2008).  Plaintiffs face a high bar in showing their neighboring property owners were similarly situated because "various factual traits, circumstantial nuances, and peculiarities can set entities apart, rendering them, by virtue of their differences, amenable to disparate treatment."  *Id.* at 530.  Here, although several Plaintiffs testified that violations existed on neighboring properties, Plaintiffs have not shown that the neighboring properties were "prima facie identical in all relevant respects," nor have they shown that DNHPI was aware of the alleged violations.  In fact, several Plaintiffs testified that they did not complain to DNHPI about the alleged violations.  Further, although Plaintiffs assume the neighboring property owners did not receive enforcement orders for the alleged violations, no evidence in the record supports this conclusion.  Because Plaintiffs have failed to show the neighboring properties were "prima facie identical in all relevant respects,"

Plaintiffs' class-of-one equal protection claim based on differential treatment between Plaintiffs and their neighbors fails.

### 3.    Substantive Due Process

Plaintiffs contend Defendants' enforcement of the housing code violated their substantive due process rights.  Plaintiffs must show that a governmental power was exercised arbitrarily and oppressively to succeed on their substantive due process claims.  *See Rozman*, 268 F.3d at 593. The government action must be arbitrary in the constitutional sense.  *Id.*  "[T]he theory of substantive due process is properly reserved for truly egregious and extraordinary cases."  *Id.*

Plaintiffs argue that Defendants' policy of "coding to the max" to force landlords to evict their tenants or sell their properties and declaring properties vacant to facilitate their condemnation is such an egregious case.  Plaintiffs base these claims on a November 13, 2002, tabular listing of problem properties containing annotations reading "code to the max" or similar.[16]  Nothing on the problem properties listing suggests that DNHPI was enforcing the housing code in an arbitrary or oppressive manner.  On the contrary, it is evident from the listing that the City had received multiple calls alleging code violations and illegal activity at the many of the properties.  Enforcement of the housing code and related provisions of the St. Paul Legislative Code achieves the legitimate interests of keeping the City's neighborhoods safe and housing habitable.  Plaintiffs have not explained how Defendants' enforcement of these codes at properties having a documented history of non-compliance constitutes a substantive due process violation.

---

[16]    Plaintiffs' characterization of these statements as "Dawkins's notes" is incorrect, as he repeatedly testified during his deposition that he did not enter the comments Defendants rely on, and no evidence suggests otherwise.

Plaintiffs also contend that Defendants intentionally delayed mailing notices.  Although Plaintiffs did not identify evidence supporting this claim in their brief, the Court notes that Sandra Harrilal testified during her deposition that she received two mailings that were postmarked two weeks after the date on the letter.  The City also sent a correction notice and notice of Tenant Remedy Action (TRA) to the rental property rather than to Harrilal's residence, and she received her rental registration certificate several days after the postmarked date. Harrilal received notice of the TRA before the hearing date when a housing inspector orally notified her of the TRA.  Harrilal also received the correction notices before the hearings. Plaintiffs speculate that the delays and misdirection were intentional, but offer no evidence in support of this claim.  While the Court must draw all reasonable inferences in favor of Plaintiffs on Defendants' motion for summary judgment, the Court shall "do so without resort to speculation."  *See Twymon*, 462 F.3d at 936.  Even if evidence of intentionally delayed or misdirected mailings existed, mailings that did not result in adverse action against Harrilal would not rise to the level of a substantive due process violation.

Plaintiffs' third argument in support of their substantive due process claim is that Defendants employed a "large and physically imposing police officer to force his way into residences to discover interior code violations."  Plaintiffs' substantive due process claim based on forced entries appears duplicative of their Fourth Amendment claims and therefore should be analyzed as such.  *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (quotations omitted)).  Even if this claim is not subsumed by Plaintiffs' Fourth Amendment claim, Plaintiffs failed to put forth

deposition testimony from the tenants supporting Plaintiffs' claims of forced entries, much less demonstrate a substantive due process violation based on these entries. Further, as discussed with respect to Plaintiffs' Fourth Amendment claims, Plaintiffs lack standing to bring claims based on searches of their tenants' apartments. *See Rozman*, 268 F.3d at 591.

Finally, Plaintiffs contend Defendants engaged in "widespread falsification of code enforcement orders." Plaintiffs conceded the legitimacy of many of the violations they received. Plaintiffs do, however, dispute the legitimacy of some violations on narrow grounds. For example, Mark Meysembourg received a correction order citing him for a number of violations, including broken kitchen cabinets. He claims that only one cabinet was broken. Assuming for the purposes of summary judgment that this type of distinction renders a citation illegitimate, Plaintiffs have put forth no evidence showing any erroneous citations were intentional. Citations containing minor errors do not rise to the level of a substantive due process violation.

In other instances, Plaintiffs argued that violations were illegitimate because their tenants created the conditions that gave rise to the violations. The housing code provides landlords with an affirmative defense to misdemeanor prosecutions on those grounds, but does not preclude enforcement of the housing code through an injunction or an order to correct violations. *See* St. Paul, Minn., Code § 34.18. In the absence of evidence demonstrating that Plaintiffs raised this defense in response to code enforcement orders or that they were entitled to do so, the Court declines to find that issuing an enforcement order for tenant-caused damage violates substantive due process.

### 4.      Fifth Amendment Takings Claim

Plaintiffs claim Defendants have taken their property without just compensation in violation of the Fifth Amendment. Plaintiffs make two arguments in support of this claim:

(1) that Defendants' enforcement of the housing code at their properties was unconstitutional and (2) that Defendants illegally required Plaintiffs to bring their properties up to the current building code through code compliance inspections.  Defendants contend that Plaintiffs' takings claims are not ripe because they have failed to pursue Minnesota state court procedures for compensation.

"[I]f a state provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."  *Koscielski v. City of Minneapolis*, 435 F.3d 898, 903-04 (8th Cir. 2006) (quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194-97 (1985)).  Plaintiffs may seek just compensation through an inverse condemnation action brought in Minnesota state court.  *See Wilson v. Ramacher*, 352 N.W.2d 389, 394 (Minn. 1984).  Plaintiffs have not pursued inverse condemnation actions.  The Court lacks jurisdiction over Plaintiffs' takings claims because they are not ripe for review.  *See Koscielski*, 435 F.3d at 903-04.

### 5.    Ninth Amendment Claim

In their Complaint, Plaintiffs asserted that Defendants violated the Ninth Amendment, which provides that "(t)he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."  U.S. Const. amend. IX. Defendants argue that the Ninth Amendment has never been recognized as independently securing any constitutional right for purposes of pursuing a civil rights claim, *see Strandberg v. City of Helena*, 791 F.2d 744, 748-49 (9th Cir. 1986), and never been used as a solid basis for any decision from the Supreme Court, *see Nat'l Assoc. of Property Owners v. United States*, 499 F. Supp. 1223, 1246 (D. Minn. 1980).

Plaintiffs did not respond to this argument and no evidence suggests that Plaintiffs have made a viable Ninth Amendment claim. The Court dismisses Plaintiffs' § 1983 claim based on the Ninth Amendment.[17]

## E.       Section 1985

Plaintiffs claim Defendants violated 42 U.S.C. § 1985 by conspiring to deny Plaintiffs and their tenants their civil rights. Defendants contend that Plaintiffs have put forth no facts showing any intent to violate Plaintiffs' civil rights, any conduct in furtherance of a conspiracy to do so, or any damages resulting from such a conspiracy.

To prove the existence of a civil rights conspiracy under § 1985(3), the Plaintiffs must prove: (1) that Defendants did conspire, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or equal privileges and immunities under the laws, (3) that one or more of the conspirators did, or caused to be done, any act in furtherance of the object of the conspiracy, and (4) that another person was injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States. *Larson by Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir. 1996) (quotation marks omitted). The "purpose" element of the conspiracy requires Plaintiffs to prove a class-based "invidiously discriminatory animus." *See id.* Plaintiffs must allege with particularity and specifically demonstrate with material facts that Defendants reached an agreement, for example, by pointing to at least some facts which would suggest Defendants reached an understanding to violate Plaintiffs' civil rights or their tenants' civil rights. *See id.*

---

[17]       Because the Court finds no constitutional or statutory violation the part of any individual defendant, any inquiry into whether the individual defendants are entitled to qualified immunity or the City's liability pursuant to *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), is unnecessary. *See Hayek v. City of St. Paul*, 488 F.3d 1049, 1054-55 (8th Cir. 2007).

In their memorandum in opposition to Defendants' motion, Plaintiffs recited the applicable law, but put forth no evidence or arguments in support of their § 1985 claim. No evidence demonstrates the requisite agreement. The Court grants summary judgment on Plaintiffs' § 1985 claim.

## F.    RICO Claims

Plaintiffs brought RICO claims against Defendants claiming violations of 18 U.S.C. § 1962(c), (d). A plaintiff who brings suit under 18 U.S.C. § 1962(c) must prove that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997).[18]

"Racketeering activity" is defined in 18 U.S.C. § 1961(1). That section lists as predicate acts certain state law crimes, conduct that is "indictable" under various federal provisions, and numerous other offenses. *Handeen*, 112 F.3d at 1353. In their Complaints, Plaintiffs based their RICO claims on seven predicate acts: mail fraud, bank fraud, wire fraud, the Hobbs Act, tampering, bribery, and interstate travel or transportation in aid of racketeering enterprises. However, in Plaintiffs' brief, they base their RICO claims on alleged false claims of housing code violations, Defendants' use of the City's housing code rather than the HQS, misrepresentations of code compliance inspections, and extortion. The Court considers each proposed predicate act in turn.

---

[18]     Counsel for Defendants brought the parties' stipulation that Plaintiffs do not assert RICO claims against the City or the individual defendants in their official capacity, filed as Docket No. 12 in *Steinhauser v. City of St. Paul*, Civil No. 04-2632, to the Court's attention at oral argument. It is unclear whether this stipulation applies to the related cases *Gallagher v. City of St. Paul*, Civil No. 05-1348, and *Harrilal v. City of St. Paul*, Civil No. 05-461. Regardless, the Court concludes that Plaintiffs have failed to raise a genuine issue of material fact as to whether Defendants violated RICO.

Plaintiffs allege Defendants violated RICO by making false claims of housing code violations. As discussed with respect to Plaintiffs' substantive due process claim, Plaintiffs have not put forth any evidence showing Defendants intentionally falsified code violations. Plaintiffs also claim Defendants violated RICO by concealing the differences between the housing code and the HQS from the public and from HUD. Defendants could not have concealed the differences because the City's housing code and the HQS are publicly available. Further, Plaintiffs fail to explain how this supposed concealment qualifies as a predicate act. Plaintiffs' arguments regarding false claims of housing code violations and concealment of the differences between the housing code and the HQS are unavailing.

Plaintiffs also contend that Defendants engaged in racketeering activity by misrepresenting the nature of a code compliance inspection to Steinhauser, Brisson, and Meysembourg. Plaintiffs assert that one or more of Defendants told these plaintiffs that a code compliance inspection would require the property to meet the housing code that was effective the date the property was built ("as built"), when in actuality a code compliance inspection required the property to meet the current housing code. Bringing a property up to the current housing code rather than the "as built" housing code would increase the cost of compliance. Plaintiffs rely on Meysembourg's affidavit as a "particularly egregious example" of the City's intent to "force as many illegal code compliances as possible."[19]

Meysembourg's code compliance inspection arose from the settlement of a TRA filed by the City against Meysembourg in which he agreed to undergo a code compliance inspection in exchange for dismissal of the TRA. While representing the City during the hearing on the TRA, Dolan informed the housing court referee:

---

[19]     Plaintiffs offered no facts specific to Steinhauser and Brisson.

> Just so the record is clear, Counsel asked the inspector, "Are you going to be
> requiring him to bring it up to the 2003 code?"  The answer was, "No.  This
> building is not a newly built building.  It will be expected to be compliant as it
> was built the year it was built."

When Meysembourg contacted the Office of License, Inspections, and Environmental Protection

(LIEP) to schedule the code compliance inspection, he was told that there was no such thing as

an "as built" code compliance inspection and that LIEP only inspected to the current code.

Meysembourg testified that the LIEP inspector stated that he would have to talk to his supervisor

about the situation, but Meysembourg did not pursue the matter further with LIEP because

Meysembourg "knew it was [the inspector's] way of brushing [Meysembourg] off."  Instead,

Meysembourg simply arranged for the inspection and "pointedly did not talk to [the inspectors]"

about the "as built" issue.

Based on the housing court record, Dolan took pains to ensure that the record reflected

that Meysembourg's code compliance inspection would be "as built."  There is no evidence that

she was familiar with the details of code compliance inspections, which LIEP, not the City

Attorney's office, conducted.  The Court is unable to reconcile Plaintiffs' assertion that Dolan

intentionally misrepresented the nature of a code compliance inspection with these facts.

Further, given that Meysembourg "pointedly did not talk" to the inspectors again about the "as

built" issue, the record does not even show that LIEP refused to conduct an "as built" inspection.

Even if Dolan had intentionally misrepresented the nature of a code compliance

inspection, Plaintiffs would still be required to show that her conduct constituted a predicate act

giving rise to RICO liability.  Generic allegations of common law fraud do not constitute

racketeering activity under RICO, *see Giuliano v. Fulton*, 399 F.3d 381, 388 (1st Cir. 2005), and

Plaintiffs have put forth no evidence showing Dolan's conduct implicated the mail or wires.

Further, Dolan's conduct does not qualify as extortion or attempted extortion because she did not

obtain or seek to obtain property from Meysembourg.  *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 405 (2003) (holding that shutting down abortion clinic was not extortion because protestors "neither pursued nor received 'something of value from' respondents that they could exercise, transfer, or sell").  Even if Dolan had intentionally misled Meysembourg, Plaintiffs have not established that her conduct constituted a predicate act.

Finally, Plaintiffs base their RICO allegations on alleged attempts at extortion by Magner.  Plaintiffs contend that Magner attempted to extort their properties from them by excessively enforcing the housing code at their properties with the intent of forcing them to sell the properties to Magner or his friends.  Plaintiffs do not offer evidence showing that Magner tried to purchase their properties.  Instead, Plaintiffs offer the affidavits of non-parties Nancy Osterman and Lois Jacobs, who claim that after the City condemned their properties, Magner tried to convince them to sell their properties to him or one of his friends at below-market rates or risk demolition of their properties.[20]  For the purposes of summary judgment, the Court assumes that enforcement of the housing code to force property owners to sell their properties to Magner or face demolition of the properties could constitute extortion and qualify as a predicate act.  *See* 18 U.S.C. § 1951(b)(2) (defining extortion as  "obtaining . . . property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.").

The Court turns to whether Magner's acts constituted "conduct of an enterprise."  *See Handeen*, 112 F.3d at 1347.  Plaintiffs identified the City as the requisite enterprise at oral

---

[20]    Defendants contend that Plaintiffs lack standing to assert RICO violations based on Magner's acts with respect to the two non-party affiants because Plaintiffs did not suffer injury as a result of those acts.  A person has standing to assert RICO claims if she experienced injury to her business or property that occurred by reason of a RICO violation.  *See Bowman v. W. Auto Supply Co.*, 985 F.2d 383, 384 (8th Cir. 1993).  Plaintiffs are not claiming standing on behalf of the affiants, but instead rely on the affidavits to establish a pattern of behavior.

argument.  A city may constitute an "enterprise" within the meaning of RICO.  *See United States v. Clark*, 646 F.2d 1259, 1263 (8th Cir. 1981).  Nevertheless, Plaintiffs have put forth no evidence showing that Magner was doing anything more than conducting his own affairs.  *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) ("liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs"); *Bennett v. Berg*, 710 F.2d 1361, 1364 (8th Cir. 1983) ("Mere participation in the predicate offenses listed in RICO, even in conjunction with a RICO enterprise, may be insufficient to support a RICO cause of action.").

Plaintiffs contend that Magner's conduct was a regular way of conducting the City's business because the City refused to address Magner's conduct when brought to its attention.  In support of this contention, Plaintiffs submitted an affidavit from Julian Jayasuriya, the purchaser of Jacobs's property.  Jayasuriya stated:

> On June 15, 2005, at the City Council hearing, I showed the City Council my receipt for the $10,000 [performance deposit] paid to the City earlier that day.  I reminded the council of our prior deal that gave me sixty days, or 30 more days from June 15, 2005, to complete the work on the Property at 14 East Jessamine.  The City Council rejected my requests and voted to demolish the property in five days.  During the Council's hearing, no one from the City ever answered my questions as to who was really benefiting from the forced demolition of the Property, or ever explained how Inspector Magner can operate his own real estate placement firm or tie forcing sales of properties into Code compliance.  Magner did not reveal his own misconduct or his real reasons for retaliating against me and this property.

In addition to Jayasuriya's affidavit, Plaintiffs submitted an affidavit from Jacobs stating:

> I was upset and decided to go to the City to meet with City officials to voice my complaints about what happened to my home.  I told the City staff that I thought it was improper for someone who worked for the City and was involved in the condemnation of my home to then make an offer to purchase my home.  Mr. Magner was present at the meeting but he made no comments.

It is unclear from these affidavits whether the City was aware of Magner's alleged extortionate conduct.  These affidavits, without more, are insufficient to permit a jury to

reasonably find that Magner's attempts at extortion were a "regular way of conducting the City's business" or the conduct of the City.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  Plaintiffs' RICO claims fail because they have not put forth evidence that raises a genuine issue of material fact as to whether Magner engaged in "conduct of an enterprise."  The Court therefore need not address the parties' arguments regarding the remaining elements of a RICO claim.

Plaintiffs also make RICO conspiracy claims under § 1962(d).  A RICO conspiracy requires proof of the additional element of an agreement, that is, the defendant must have objectively manifested an agreement to participate directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes.  *United States v. Bennett*, 44 F.3d 1364, 1374 (8th Cir. 1995).  Plaintiffs have put forth no evidence that any Defendant entered into the requisite agreement.  Plaintiffs' RICO conspiracy claim fails.

## G.      Void for Vagueness Claim

The Gallagher plaintiffs contend that certain terms found in the City's housing code or used by DNHPI as part of its code enforcement policies are unconstitutionally void for vagueness.[21]  Defendants contend that Plaintiffs did not set forth any evidence establishing that these terms are unconstitutionally vague.  In their memorandum in opposition to Defendants'

---

[21]      Plaintiffs' brief identifies the following plaintiffs as injured by the alleged vagueness of these terms:  Steinhauser, Harrilal, the Dadder's entities, the Kubitschecks, Meysembourg, Johnson, Brisson, and Allison.  As Plaintiffs acknowledge in their brief, only the Gallagher plaintiffs made a void for vagueness claim in their Complaint.  The Court will not consider any void for vagueness claim by Steinhauser, Harrilal, Meysembourg, Johnson, and Brisson because they did not plead a void for vagueness claim in their Complaints, the time for amending has passed, and these plaintiffs have not made a motion to amend their Complaints.  Further, Plaintiffs have not put forth evidence establishing that these plaintiffs have standing to assert a void for vagueness claim or relating to any such claim.

motion, the Gallagher plaintiffs challenge the terms "vacant building," "code compliance," and "problem properties."  Plaintiffs offered evidence relating to a property located at 1522/1524 Carroll Avenue in support of their argument regarding the term "vacant building."  This property is an upstairs/downstairs duplex and one of seven properties Troy Allison purchased from the Dadder's entities.

"The void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth amendments."  *Woodis v. Westark Community Coll.*, 160 F.3d 435, 438 (8th Cir. 1998).  A vague regulation violates the Constitution because it fails (1) to define the offense with sufficient definiteness that ordinary people can understand prohibited conduct and (2) to establish standards to permit enforcement of the law in a non-arbitrary, non-discriminatory manner.  *Id.*  "In a facial vagueness challenge, an enactment reaching a substantial amount of constitutionally protected conduct may withstand constitutional scrutiny only if it incorporates a high level of definiteness.  An enactment imposing criminal sanctions or implicating constitutionally protected rights demands more definiteness than one which regulates the economic behavior of businesses."  *Id.* (citations omitted).

The Court must first "determine whether the enactment reaches a substantial amount of constitutionally protected conduct."  *Id.*  Where the enactment does not reach constitutionally protected conduct, a plaintiff may succeed in a vagueness challenge "only if the enactment is impermissibly vague in all of its applications."  *Id.* (quotation marks and citations omitted).  For these reasons, the Court must "examine the [plaintiff's] conduct before analyzing other hypothetical applications of the law, because a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to . . . others."  *Id.* (quotation marks and citations omitted).

The St. Paul Legislative Code defines "vacant building" as:

A building or portion of a building which is:

a.      Unoccupied and unsecured;

b.      Unoccupied and secured by other than normal means;

c.      Unoccupied and a dangerous structure;

d.      Unoccupied and condemned;

e.      Unoccupied and has multiple housing or building code violations;

f.      Condemned and illegally occupied; or

g.      Unoccupied for a period of time over three hundred sixty-five (365) days and during which time the enforcement officer has issued an order to correct nuisance conditions.

St. Paul, Minn., Code § 43.02(7).  There is no suggestion that the definition of "vacant building," which rests on the occupancy of a building, whether it is secure from entry, and the condition of the building, reaches constitutionally protected conduct.  The Court therefore examines the Gallagher plaintiffs' arguments regarding the vagueness of "vacant building" in light of the their conduct.  *See Woodis*, 160 F.3d at 438.

The Gallagher plaintiffs' challenge focuses on the meaning of "unoccupied" as used in the definition of "vacant building."  The St. Paul Legislative Code defines "unoccupied" as "[a] building which is not being used for a legal occupancy as defined in the Saint Paul Legislative Code."  St. Paul, Minn., Code § 43.03(5).  The St. Paul Legislative Code does not define "legal occupancy," but does define "residential occupancy" as "[o]ccupancy in a building or portion thereof, for residential purposes, used or intended to be used for living, sleeping, and/or cooking or eating purposes."  *Id.* § 40.03.

During his deposition, Allison testified that the downstairs tenant had moved out shortly before Allison purchased 1522/1524 Carroll Avenue.  Allison also testified that the downstairs

unit was "vacant" when he purchased the property and when the City declared the property a vacant building.  Thus, Allison does not dispute that the downstairs unit was unoccupied when the City declared the property vacant.  Further, Allison does not dispute that the property had housing code violations.  A unit that is unoccupied and has multiple housing code violations, as the downstairs unit of 1522/1524 Carroll Avenue did, falls within the definition of a vacant building, *see id.* § 43.02(7)(e), and is clearly proscribed.  Allison lacks standing to challenge the term "vacant building" on the grounds that it is unconstitutionally vague "because a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to . . . others."  *See Woodis*, 160 F.3d at 438 (quotation marks and citations omitted).[22]

The Gallagher plaintiffs also cite to testimony from Dawkins and Dick Lippert, the former head of DNHPI's problem property unit, that they did not have a definition for "problem property," "code compliance," "legal occupancy," or "vacant building."  Because the Gallagher plaintiffs have set forth no facts establishing their standing to raise void for vagueness claims as to these terms, this testimony is unavailing.  The Court dismisses the Gallagher plaintiffs' void for vagueness claims.

---

[22]    The Gallagher plaintiffs also base their void for vagueness challenge on the fact that a tenant was living in the upstairs unit of 1522/1524 Carroll Avenue when the inspector declared the building vacant.  The inspector based his decision to declare the entire building vacant on the vacancy of the lower unit and his observation of the second story while standing on the ground. While the decision to declare the entire building vacant was incorrect, this does not make the term "vacant building" unconstitutionally vague.  In fact, the definition of "vacant building" permits for the designation of a "portion of a building" as a vacant building.  St. Paul, Minn., Code § 43.02(7).

**H.      Antitrust Claim**

**1.      Antitrust Standing**

The Gallagher plaintiffs contend that Defendants' conduct violates the antitrust laws.  To succeed on their antitrust claims, the Gallagher plaintiffs must first demonstrate that they have suffered an "antitrust injury" as a result of the alleged conduct of Defendants and have standing to pursue a federal antitrust claim.  *See In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006).  An "antitrust injury" is an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  Defendants contend that the Gallagher plaintiffs lack antitrust standing because they have not suffered an antitrust injury.

Other than reciting the legal standard for antitrust standing and injury, the Gallagher plaintiffs devote a single sentence in their brief to their antitrust standing:

> In this case, the 82% more stringent code that the City applies to the private market landlords, and the failure to enforce its own code against its sister agency PHA, in light of the knowledge the City possesses with respect to the application of a more stringent code and the effect that it has on affordable housing providers, meets the factors discussed above as Plaintiffs have been injured in their business by the City's conduct.

This sentence is insufficient to raise a genuine issue of material fact as to antitrust standing or antitrust injury, particularly given the absence of evidence showing that the City's enforcement of its housing code has any impact on consumers of low-income housing or demonstrating that the City does not enforce its housing code against PHA.  "Skeletal allegations, unsupported with specific facts or evidence, are insufficient to create a genuine issue of fact so as to preclude summary judgment."  *Thomas v. Corwin*, 483 F.3d 516, 530 (8th Cir. 2007).

Further, the Gallagher plaintiffs make arguments with respect to the injury the City's housing code inflicts on "affordable housing providers."  It is the consumers of low-income housing who are protected by the antitrust laws, not competitors.  *See Brunswick*, 429 U.S. at 488.  Injury to competitors is not an antitrust injury because it is not the type of injury the antitrust laws were intended to prevent.  *See id.*

The Gallagher plaintiffs assert in their Complaint "both PHA and Plaintiffs are providing low income housing to a low income market and are competitors of each other for low income tenants in the City."  The Gallagher plaintiffs also claim:

> If Defendants applied the same nature and volume of code enforcement operations against PHA that Defendants have directed, and continue[] to, direct against Plaintiffs and other similarly situated landlords, PHA would suffer short and long term adverse financial consequences, including an adverse effect on PHA's cash flow, forced sale of rental properties to make up cash short falls, increased layoffs of PHA employees, which would all result in an adverse impact on the protected class tenants renting from PHA.

Thus, the Gallagher plaintiffs base their antitrust claims on the fact that PHA has an economic advantage over them because PHA is subject to a lower level of code enforcement.

Although preferential treatment of PHA may concern the Gallagher plaintiffs, they have not shown an antitrust injury because they have shown no harm to consumers or competition. *See Juster Assoc. v. City of Rutland, Vt.*, 901 F.2d 266, 270 (2d Cir. 1990) (no antitrust injury when city subsidized new shopping mall even though it placed plaintiff at a disadvantage because no harm to consumers).  The Gallagher plaintiffs therefore lack antitrust standing.

### 2.     Local Government Antitrust Act

Defendants also contend that the Local Government Antitrust Act (LGAA), 15 U.S.C. §§ 34-36 (2000), provides them with immunity from antitrust damages.  The LGAA prohibits recovery of damages, interest on damages, costs, or attorney's fees for damages from any local government, or official or employee acting in an official capacity as a result of a private antitrust

action.  15 U.S.C. § 35(a).  The City of St. Paul is a local government within the meaning of the

LGAA.  *See id.* § 34(1)(a).  The Gallagher plaintiffs have not offered evidence showing that any

City officials or employees exceeded their authority.  The LGAA immunizes the City and the

individual defendants, to the extent they were working in their official capacities, from the

Gallagher plaintiffs' suit seeking damages for antitrust violations.  *See id.* § 35.

### 3.    State Action Doctrine

To the extent that the Gallagher plaintiffs seek injunctive relief for Defendants' allegedly

anticompetitive conduct, Defendants contend that that the state action doctrine articulated in *City

of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991), bars the Gallagher

plaintiffs' antitrust claim.  Under *Omni*, a municipality's conduct is immune from antitrust

scrutiny if the state granted the municipality both (1) the authority to regulate and (2) the

authority to suppress competition.  499 U.S. at 372-73.  To satisfy the second prong, the

municipality's acts must be the "foreseeable result of the state authorization."  *Id.*

The Minnesota Legislature has granted municipalities the following authority:

> For the purpose of promoting the public health, safety, morals, and general
> welfare, a municipality may by ordinance regulate on the earth's surface, in the
> air space above the surface, and in subsurface areas, the location, height, width,
> bulk, type of foundation, number of stories, size of buildings and other structures,
> the percentage of lot which may be occupied, the size of yards and other open
> spaces, the density and distribution of population, the uses of buildings and
> structures for trade, industry, residence . . . and may establish standards and
> procedures regulating such uses.

Minn. Stat. § 462.357, subd. 1 (2006).  Minnesota Statutes § 462.362 (2006) authorizes

municipalities to "enforce any provision of sections 462.351 to 462.364 or of any ordinance

adopted thereunder by mandamus, injunction, or any other appropriate remedy in any court of

competent jurisdiction."

In addition, the Minnesota Legislature grants city councils the "power to provide for . . . promotion of health, safety, order, convenience, and the general welfare by such ordinances not inconsistent with the Constitution and laws of the United States or of this state as it shall deem expedient," Minn. Stat. § 412.221, subd. 32 (2006), and requires residential landlords "to maintain the premises in compliance with the applicable health and safety laws of the state, and of the local units of government where the premises are located," *id.* § 504B.161, subd. 1(a)(4). Thus, the State of Minnesota has expressly authorized municipalities such as the City to enact zoning ordinances regulating the uses of "buildings and structures . . . for residence," to "establish standards and procedures regulating such uses," and to enforce those uses through ordinances or other appropriate remedies.  The City's housing code, which is a standard regulating the use of residential property and promoting the health and safety of City residents, falls within this grant of legislative authority, thereby meeting the first *Omni* requirement.

With respect to the second prong of the *Omni* test, a grant of zoning authority has the foreseeable result of restricting competition.  499 U.S. at 373 ("The very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition . . . .").  Further, the Minnesota Legislature expressly requires residential landlords to comply with the health and safety laws "of the local units of government where the premises are located."  Minn. Stat. § 504B.161, subd. 1(a)(4).  The housing code meets the second *Omni* requirement.  The state action doctrine bars the Gallagher plaintiffs from seeking injunctive relief under the antitrust laws.

I.      **State Law Claims**

Plaintiffs make three state law claims:  (1) abuse of process, (2) tortious interference with contract, and (3) tortious interference with Plaintiffs' business expectancy.  To succeed on an

abuse of process claim, Plaintiffs must show that there was an ulterior purpose and that Defendants used the process to achieve something not within the scope of the proceedings. *Kittler & Hedelson v. Sheehan Props., Inc.*, 203 N.W.2d 835, 840 (Minn. 1973).  To prevail on a tortious interference with contract claim, Plaintiffs must show (1) the existence of a contract; (2) Defendants' knowledge of the contract; (3) Defendants' intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom.  *See Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900 (Minn. 1982).  Success on Plaintiffs' tortious interference with business expectancy claim requires a showing of (1) the existence of a reasonable expectation of economic advantage or benefit belonging to Plaintiffs; (2) that Defendants had knowledge of that expectation of economic advantage; (3) that Defendants wrongfully and without justification interfered with Plaintiffs' reasonable expectation of economic advantage or benefit; (4) that in the absence of the wrongful acts of Defendants, it is reasonably probable that Plaintiffs would have realized their economic advantage or benefit; and (5) that Plaintiffs sustained damages as a result of this activity.  *See Harbor Broad., Inc. v. Boundary Waters Broad., Inc.*, 636 N.W.2d 560, 569 (Minn. Ct. App. 2001).

Defendants contend that Plaintiffs have not have not shown any ulterior motive behind the City's code enforcement, that Defendants used the process to achieve something not within the scope of code enforcement proceedings, or that Defendants intentionally procured breaches of Plaintiffs' contracts with their tenants.  Defendants additionally contend that Plaintiffs could not have had a reasonable expectation of economic advantage in renting properties that had housing code violations to low-income households.  Plaintiffs cited the legal standard in response, but made no argument and offered no evidence in support of their state law claims. Because Plaintiffs fail to sustain their burden as to their state law claims, the Court grants

Defendants summary judgment on all three claims.[23]  *See Rodgers v. City of Des Moines*, 435 F.3d 904, 907-08 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments"); *Nw. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662-63 (7th Cir. 1994) ("District judges are not archaeologists."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Nicholas Acoustics & Specialty Co. v. H & M Constr. Co.*, 695 F.2d 839, 846-47 (5th Cir. 1983) ("Judges are not ferrets!").

Finally, the Court addresses the voluminous materials—four file boxes worth— submitted by Plaintiffs in opposition to Defendants' motions for summary judgment.  The volume of documents submitted, of course, is not a dispositive factor in determining whether summary judgment is proper.  The multitudinous documents filed by Plaintiffs increased the burdensomeness of the Court's task in deciding these motions, for Plaintiffs' failure to winnow out the relevant documents meant that the burden of doing so fell to the Court.  In the immortal words of [perhaps] Mark Twain, "I'm sorry this letter is so long, but I did not have time to make it shorter."[24]  However, the Court has carefully considered the documents submitted and the arguments made by the parties in making its decision, and determines that summary judgment is warranted.

---

[23]     Defendants also contend that statutory and official immunities bar Plaintiffs' state law claims.  Because Plaintiffs have not shown a genuine issue of material fact as to any of their state law claims, the Court need not decide whether Defendants are entitled to these immunities.

[24]     It appears that this quotation is properly attributed to seventeenth century French mathematician and philosopher Blaise Pascal, who wrote in 1656 "I have made this letter longer than usual only because I had not the time to make it shorter."  *See* Ralph Keyes, The Quote Verifier: Who Said What, Where, and When 119-20 (2006).

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.    Defendants' Motions for Summary Judgment [Docket No. 198 in Civil
No. 04-2632, Docket No. 173 in Civil No. 05-461, and Docket No. 166 in
Civil No. 05-1348] are GRANTED.

2.    All Counts in Civil Nos. 04-2632, 05-461, and 05-1348 are DISMISSED
WITHOUT PREJUDICE as to John Doe, Jane Doe, and Jane Roe.

3.    Counts VI in Civil Nos. 04-2632, 05-461, and 05-1348 are DISMISSED
WITHOUT PREJUDICE to the extent they are based on the right to
freedom from the taking of property without just compensation under the
Fifth Amendment to the U.S. Constitution.

4.    Count VIII in Civil No. 05-1348 is DISMISSED WITHOUT
PREJUDICE.

5.    Except as stated in paragraphs 2-4, all remaining claims in Civil Nos.
04-2632, 05-461, and 05-1348 are DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 18, 2008

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge